IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DONALD DAVID DILLBECK,

       Petitioner,

v.                          CASE NO.:   4:07-cv-388/SPM

WALTER A. McNEIL,

       Secretary, Fla. Dept. of Corrections, et al.,  and

BILL McCOLLUM,

       Attorney General of Florida,
       Respondents.
_____/

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

THIS CAUSE is before the court on an amended petition for a writ of habeas corpus filed by Donald David Dillbeck, a Florida death row inmate, pursuant to Title 28, United States Code, Section 2254 (doc. 12). Petitioner has asserted seven claims for relief. Respondents have filed an answer (doc. 9). After careful consideration of the issues raised in the pleadings and for the reasons stated below, the petition is denied.

### I. FACTS & PROCEDURAL HISTORY

The relevant facts are set out as follows in the Florida Supreme Court's opinion affirming Petitioner's conviction and sentence:

> Dillbeck was sentenced to life imprisonment for killing a policeman with the officer's gun in 1979. While serving his sentence, he walked away from a public function he and other inmates were catering in Quincy, Florida. He walked to Tallahassee, bought a paring knife, and attempted to hijack a car and driver from a shopping mall parking lot on June 24, 1990. Faye Vann, who was seated in the car, resisted and Dillbeck stabbed her several times, killing her. Dillbeck attempted to

flee in the car, crashed, and was arrested shortly thereafter and charged with first-degree murder, armed robbery, and armed burglary. He was convicted on all counts and sentenced to consecutive life terms on the robbery and burglary charges, and, consistent with the jury's eight-to-four recommendation, death on the murder charge.

Dillbeck v. State, 643 So.2d 1027, 1028 (Fla. 1994)(per curiam)("Dillbeck I"), cert. denied, Dillbeck v. Florida, 514 U.S. 1022, 115 S. Ct. 1371, 131 L. Ed. 2d 226 (1995).

Petitioner was tried in Leon County, Florida, and convicted of first-degree murder, armed robbery and armed burglary. The trial court followed the jury's eight-to-four recommendation and sentenced Petitioner to death on the first-degree murder charge, finding five aggravating circumstances: (1) Petitioner was under sentence of imprisonment when he committed the murder; (2) Petitioner had previously been convicted of another capital felony; (3) the murder was committed during the course of a robbery and burglary; (4) the murder was committed to avoid arrest or effect escape; and (5) the murder was especially heinous, atrocious, or cruel. Dillbeck I, 643 So.2d at 1028 n.1. The trial court found one statutory mitigating circumstance, that Petitioner was substantially impaired, and numerous nonstatutory mitigating circumstances: (1) Petitioner had an abused childhood; (2) he suffers from fetal alcohol effect as a result of his mother's alcohol consumption, (3) he suffers from mental illness; (4) his mental illness is treatable; (5) his imprisonment at an early age in a violent prison; (6) his good behavior as an inmate; (7) he has a loving family; and (8) he has demonstrated remorse. The trial court noted that while these circumstances were present, several of them were entitled to little weight. Id. at 1028 n.2.

Petitioner's convictions and death sentence were affirmed on direct appeal.[1]

---

[1]Petitioner raised the following ten claims of trial court error on the following issues: (1) juror qualifications; (2) evidence of specific intent; (3) requiring Petitioner to submit to a psychological exam by the State's expert; (4) flight instruction; (5) testimony of the State's mental health expert; (6) jury instruction on the heinous, atrocious, or cruel aggravating circumstance; (7) the finding of heinous, atrocious, or cruel; (8) jury instruction on escape; (9) proportionality; and (10) the allocating of the burden of proof in the penalty phase. Dillbeck v. State, 643 So.2d 1027, 1028 n.3 (Fla. 1994).

(See Dillbeck I). In 1997, Petitioner filed an initial Rule 3.850 motion for postconviction relief and filed an amended motion in 2001 which was denied by the postconviction court.[2] The Florida Supreme Court affirmed the denial of postconviction relief regarding one claim and remanded the case to the Second Judicial Circuit Court to enter sufficient findings of fact and conclusions of law with regard to all other of his postconviction claims. See Dillbeck v. State, 882 So.2d 969 (Fla. 2004)(per curiam)("Dillbeck II"). On remand the postconviction court again denied Petitioner's postconviction claims, and the Florida Supreme Court affirmed the denial of postconviction relief. See Dillbeck v. State, 964 So.2d 95 (Fla. 2007)(per curiam)("Dillbeck III"). Petitioner also filed a petition for a writ of habeas corpus in state court which was denied by the supreme court.[3] See Dillbeck II, 882 So.2d at 976-77.

Petitioner filed an initial federal petition for a writ of habeas corpus on September 7, 2007, raising two grounds for relief. Doc. 1. After requesting and being granted leave to amend, Petitioner filed his amended petition on December 28, 2007. Doc. 12. Respondents filed an answer to the initial habeas petition (doc. 9) and a motion to dismiss Claims II, V, and VI of the amended petition. Doc. 14. This court granted Respondents' motion to dismiss on March 27, 2008. Doc. 16. The petition is ripe for adjudication on the remaining four claims.

## II. EVIDENTIARY HEARING

Petitioner requests a plenary evidentiary hearing on the claims presented in

---

[2]Petitioner raised the following claims for relief: he was denied effective assistance of counsel because his trial attorney (1) conceded the heinous, atrocious, or cruel aggravating factor; (2) failed to conduct proper voir dire by challenging certain jurors for cause; (3) failed to move for a change of venue; (4) failed to request a PET scan and (5) introduced details of his previous criminal activity to the jury during the penalty phase of the trial. Petitioner also alleged that his attorney conceded his guilt without his consent and that he was denied a presumption of innocence because he was forced to wear restraints during the trial. Dillbeck v. State, 882 So.2d 969, 971 (Fla. 2004).

[3]Petitioner raised one claim in his state habeas petition, challenging the validity of his death sentence by arguing that Florida's capital sentencing statute is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

his petition.   Doc. 12 at 2.  28 U.S.C. § 2254(e)(2)(2002) provides for an evidentiary hearing in federal habeas claims under very limited circumstances:

> **(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--**
>
> > **(A) the claim relies on--**
> > > **(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or**
> > > **(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and**
> >
> > **(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.**

Petitioner was granted an evidentiary hearing in state court.   Petitioner has not presented  nor proffered any evidence to this court which would necessitate an evidentiary hearing on any of the claims he presents.   See Kelley v. Sec.'y for Dep't of Corr., 377 F.3d 1317, 1334-37 (11th Cir. 2004)(capital petitioner met none of the requirements contained in 28 U.S.C. § 2254(e)(2), thus district court abused discretion in granting evidentiary hearing).   Under Section 2254(e) a hearing is inappropriate "if such a hearing would not assist in the resolution of [the] claim." Breedlove v. Moore, 279 F.3d 952, 960 (11th Cir. 2002) (citation omitted). Stated affirmatively, "'a habeas petitioner is entitled to an evidentiary hearing if he or she alleges facts that, if proved at the hearing, would entitle petitioner to relief.'" Id. (quoting Meeks v. Singletary, 963 F.2d 316, 319 (11th Cir. 1992)).  In a post-AEDPA world, whether petitioner would be entitled to relief is considered in light of the heavy presumptions in favor of sustaining the state court adjudication.   Because Petitioner has not met the requirements for an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2), his request for an evidentiary hearing will be denied.

### III.  STANDARD OF REVIEW

**Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.  In relevant part, section 2254(d) now provides:**

> **(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–**
>
> > **(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or**
> >
> > **(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.**

**28 U.S.C.A. § 2254 (2002).**

**The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[4]  The appropriate test was described by Justice O'Connor as follows:**

> **In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a**

---

[4]Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id., 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), overruled on other grounds by Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither

the reasoning nor the result of the state-court decision contradicts them." **Early v. Packer**, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting **Williams**, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." **Williams**, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. **Holland v. Jackson**, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. **Bell v. Cone**, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." **Putman v. Head**, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." **Williams**, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); <u>see</u> <u>e.g.</u> <u>Miller-El</u>, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); <u>Jones v. Walker</u>, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. <u>See</u> <u>Panetti v. Quarterman</u>, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); <u>Jones</u>, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Finally, in the event that constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in <u>Brecht v. Abrahamson</u>, 507 U. S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). The test is "whether the error 'had

substantial and injurious effect or influence in determining the jury's verdict.' Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but are not entitled to habeas relief based on trial error unless they can establish 'actual prejudice.'" Id. at 637 (quoting Kotteakos v. United States, 328 U. S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 1557 (1946)).[5]

Within this framework, the court will review Petitioner's claims.

## IV.    PETITIONER'S CLAIMS

**Ground I:   Ineffective Assistance of Counsel:  Failure to Conduct a Proper Voir Dire**

Petitioner contends that he received ineffective assistance of counsel when his  trial counsel failed to challenge prospective jurors for cause who either had prior knowledge of the case or exhibited biased views of the case.  See doc. 12, 5-9.

**1.     State Court Proceedings**

Petitioner raised this issue in his amended motion for postconviction relief, and the postconviction court denied relief.  The Florida Supreme Court affirmed the denial of relief, holding as follows:

> Dillbeck claims two grounds for which counsel should have asserted for-cause challenges: (1) exposure to pretrial publicity; and (2) inclination to impose the death penalty.

> The postconviction trial court made these findings on this issue, which are supported by competent, substantial evidence.

>> [At the postconviction evidentiary hearing,] [t]rial counsel, Mr. Murrell, testified that he approached jury selection with a genuine concern that "a lot of people would be inclined maybe automatically for death given the circumstances of the case." Mr. Murrell testified that "it was pretty clear to me that Mr. Dillbeck was going to get convicted of first

---

[5]This harmless error standard is also applicable to cases involving habeas challenges to death sentences.  See Calderon v. Coleman, 525 U.S. 141, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998); Duest v. Singletary, 997 F.2d 1336 (11th Cir. 1993); Hicks v. Head, 333 F.3d 1280 (11th Cir. 2003).

degree murder." He went on to testify he hoped that "maybe we could get felony murder as opposed to premeditated murder ... [and] convince a jury to recommend a life sentence." Mr. Murrell testified he approached jury selection with an eye toward getting rid of those you think will be unfavorable and to end up with a jury you have a chance with. Although he talks to his client about potential jurors, he believes the final decision is up to him. As trial counsel explained, jury selection is a give and take. "Your best hope is just to get rid of those you think will be unfavorable, and to typically end up with something you hope is at least neutral or that you have got a chance with."

Dillbeck testified at the hearing that there were a "couple [of] people" he had a question about but they were excused. When asked whether he had questions about any other juror, Mr. Dillbeck testified that he did not believe he did.

This Court finds Mr. Murrell's testimony regarding jury selection to be credible. The Court also finds that none of the jurors were biased due to their exposure to pre-trial publicity, and thus, this Court would not have granted the cause challenges had counsel made such challenges. The seven actual jurors were not subject to challenge for cause because, while most of them were exposed to pre-trial publicity, each assured the trial court that they could decide the case based solely on the evidence. None of the actual jurors knew of the prior capital felony conviction. Trial counsel was not ineffective for failing to challenge jurors who were not biased.[1]

---

[1] Two of the complained of jurors were alternates only who did not participate in the jury's verdict. Dillbeck cannot show prejudice based on alternate jurors that never served.

(Record citations omitted.) The trial court concluded that counsel's strategy was reasonable and that there was no legal basis for challenging the jurors. Therefore, the court held that counsel's performance was not deficient. The court also determined that there was no prejudice because each juror was carefully questioned, and no potential bias was found. We agree with the trial court that Dillbeck has demonstrated neither deficiency nor prejudice.

First, Dillbeck claims that counsel should have challenged most of the jurors based on exposure to pretrial publicity. More than mere exposure to pretrial publicity must be shown to establish such a claim. As the United States Supreme Court has stated:

> It is not required ... that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S. Ct. 1639, 6 L. Ed.2d 751 (1961). Thus, the mere fact that most of Dillbeck's jurors were exposed to pretrial publicity and may have formed preconceived opinions on the case is not enough to disqualify them. In this case, each juror was asked about exposure to pretrial publicity, and each juror assured the court that he or she could lay aside any impression or opinion and render a verdict based solely on the evidence presented in court.

Second, Dillbeck claims that counsel should have challenged some of the jurors who were inclined to vote for the death penalty. Dillbeck's trial counsel adopted a reasonable trial strategy of avoiding a death sentence by attempting to seat jurors likely to recommend a life

sentence. See Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995) (holding that counsel adopted a reasonable strategy not to object to a juror who he felt would be less likely to recommend the death penalty, even though the juror had been exposed to pretrial publicity and stated during voir dire that she could not be impartial). All of Dillbeck's jurors stated that they would vote for life if the mitigating factors outweighed the aggravating factors. This claim is without merit.

Dillbeck III, 964 So.2d at 101-03.

2.      Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under Strickland, a habeas petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Id., 466 U.S. at 687. It is the petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable and that he suffered prejudice as a result thereof. Id. If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. Id. at 697.

In determining whether counsel's performance was reasonable, the Court instructed:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133–134, 102 S. Ct. 1558, 1574–1575, 71 L. Ed.2 d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the

> presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." <u>See</u> <u>Michel v. Louisiana</u>, <u>supra</u>, 350 U.S. at 101, 76 S. Ct. at 164.

<u>Strickland</u>, 466 U.S. at 689.

As to the prejudice prong of the <u>Strickland</u>, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" <u>Strickland</u>, 466 U.S. at 693. However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. <u>Strickland</u>, 466 U.S. at 693–94. Instead,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

<u>Id</u>. at 694. Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. <u>Williams v. Taylor</u>, <u>supra</u>, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. <u>Strickland</u>, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Id</u>. at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision

reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

Id. at 695–96.

3.     Federal Review of Claim

The Florida Supreme Court cited Strickland as the legal standard for analyzing claims of ineffective assistance of counsel and applied those standards to the facts of Petitioner's claims. Dillbeck III, 964 So.2d at 98-99. Therefore, the state court applied the correct legal rule based on Supreme Court precedent. The remaining issue is thus whether the state court's denial of Petitioner's claim resulted in an unreasonable application of Strickland.

a.     Juror Melinda Whitley

Petitioner contends that as demonstrated by her testimony during voir dire, Ms. Whitley "had already made up her mind that Mr. Dillbeck should at the very least be behind bars for eternity." Doc. 12 at 6. A review of the record, however, does not support such a contention.

Ms. Whitley testified she had some familiarity with the case, having read newspaper articles and discussed the crime with friends. She also had been at Gayfers with her children within an hour and a half to two hours of the crime. Trial Record ("T") Vol. II at 197-98. While Ms. Whitley knew that Petitioner had escaped from incarceration, she did not know what crime he had previously committed. Id. at 199. She testified that although she felt that the officials who were responsible for the escape were negligent, she had not formed an opinion as to Petitioner's guilt. Id. Ms. Whitley stated she could set aside her opinions about the officials' negligence and determine an appropriate penalty based solely on what occurred in the courtroom. Id. at 200. While she had no moral or religious scruples against the imposition of the death penalty, she would rate herself a four on a ten point scale, with one being strongly in favor of the death penalty. Id. at 201, 206. Concerning her feelings about the death penalty, she stated, "I personally feel that for the State of Florida, it's a good

thing. I think it probably stops a lot of the crime in our area because we do have it." Id. at 202.

When examined by defense counsel, Ms. Whitley testified that she did not have enough information to know whether the death penalty is imposed fairly or whether she would be more or less likely to vote for death than the average person, but if she had to guess she would probably be less likely than the average person to vote for death. Id. at 207-08. Ms. Whitley was told by defense attorney Randy Murrell that the crime was "particularly brutal" and that the victim was "stabbed repeatedly." Id. at 209. Even given these facts, Ms. Whitley testified that she could vote for life instead of death if the mitigating circumstances outweighed the aggravating ones. Id. While Ms. Whitley testified that even though she felt some personal fear when she heard about the crime, she could still vote for a life sentence. Id. at 210. When given a series of hypotheticals,[6] Ms. Whitley responded as follows if the mitigating circumstances outweighed the aggravating ones: if the case involved a rape and murder, she could vote for life; if more than one person were killed, she could vote for life but it would be "extremely hard;" if the defendant had previously killed someone else, she could vote for life; if the defendant had been convicted of a prior murder, escaped and murdered again, she could vote for life; if the prior conviction had involved the murder of a policeman, she could vote for life but it would be "harder." Id. at 211-12. Finally, she did not believe that death would be warranted where the defendant was a minor or was significantly mentally retarded. Id. at 212.

b.    Juror Cynthia Krell

Ms. Krell recalled having briefly read about the case in the newspaper after the facts were recited in court, but she believed that she could put what she had read out of her mind and stated that she had not formed an opinion as to Petitioner's guilt. T. Vol. III at 394-95, 402. Ms. Krell testified that she had no moral or religious scruples

---

[6]Defense counsel proposed various hypotheticals to all of the prospective jurors to determine if there were factual scenarios which would prevent them from voting to recommend a life sentence even if the mitigating circumstances outweighed the aggravating ones.

against the death penalty.  <u>Id</u>. at 395.  She testified that she did not have an opinion with regard to mental health issues as far as being receptive or not receptive to them. Ms. Krell stated that she would listen and weigh any evidence establishing that Petitioner had a mental illness.  She also stated that she could recommend the death penalty even if Petitioner had a mental illness if the aggravating circumstances outweighed the mitigating ones.  <u>Id</u>. at 401.

On examination by defense counsel, Ms. Krell rated herself a four on a scale of one to ten, with one being strongly in favor of the penalty and ten being strongly opposed to the penalty.  <u>Id</u>. at 403.  She did not believe that changing the law to keep anyone convicted of first-degree murder sentenced to life imprisonment in jail for the rest of their lives would have any effect on the need for the death penalty.  <u>Id</u>.  Ms. Krell stated that she was not familiar enough with the death penalty to have an opinion on whether it is imposed fairly.  <u>Id</u>. at 404.  She believed that the death penalty discouraged people from committing murder and felt that it would be an appropriate penalty for someone convicted of raping a child.  <u>Id</u>.  She felt that she is "maybe a little less" likely than the average person to vote to sentence someone to death, but there is nothing about the death penalty that she thinks is wrong or that concerns her.  <u>Id</u>. at 405.  When told that Petitioner committed the crime and that it was brutal, Ms. Krell shook her head when asked if she could vote for a life sentence if she found that the mitigating circumstances outweighed the aggravating ones.  She found this information "very disturbing," but indicated that she could vote for life if the law required it.  <u>Id</u>. at 406-07.  When asked the series of hypotheticals, Ms. Krell stated in each case that she could vote for life as long as the mitigating circumstances outweighed the aggravating ones.  <u>Id</u>. at 407-08.  Finally, she testified that depending on the crime, the death penalty could be appropriate for a minor, but that she did not think it would be warranted for someone who is significantly mentally retarded.  <u>Id</u>. at 409.

c.    **Juror Jason Zippay**

When asked about whether he was familiar with the case, Mr. Zippay answered that he was familiar with the case and "assuming that everything I read in the newspaper was true, I'm sure he is guilty."  T. Vol. VI at 799.  Mr. Zippay had not, however, formed an opinion about an appropriate penalty.  Id. at 800.  While he knew from reading newspaper accounts that Petitioner had escaped from a work release program, Mr. Zippay did not know what previous crime Petitioner had been convicted of, and he felt that he could put everything he knew aside and make a decision solely on what was presented in court.  Id. at 800-01, 807.  Mr. Zippay did not have any moral or religious objection to the death penalty and would be open to mental health evidence.  Id. at 805.  When asked by defense counsel to describe his feelings about the death penalty,  Mr. Zippay stated:

> I never thought about that before.  I guess my view is that if you see fit to kill someone else, I don't see how you can live in society.  Now, whether or not you should be put to death or you should spend your life in prison, I guess that would depend on the particular case.  But, I wouldn't just throw out the death penalty and say under no circumstances should it ever be applied.

Id. at 807-08.  He rated himself a three on a scale of one to ten (one being strongly in favor of the death penalty).  Id. at 808.   Mr. Zippay did not know whether the death penalty is imposed fairly, but felt that it discourages some people from committing murder.  Id. at 809.   There was nothing that troubled him about the death penalty, and he felt that he would probably do what the average person would do in voting to impose the sentence of death.  Id.  When asked the series of hypotheticals by defense counsel, in each instance Mr. Zippay stated that he could vote for life rather than death if the mitigating circumstances outweighed the aggravating circumstances.  Id. at 810-11.  Mr. Zippay testified that his wife is Cambodian and lived through the war and thus had had a difficult childhood which she had shared with him.  Id. at 812-13.  Finally, Mr. Zippay did not believe that the death penalty would ever be justified for minors or for someone who is significantly mentally retarded.  Id. at 813.

### d.     Juror John Marshall

Mr. Marshall testified that he had some familiarity with the case based on news accounts.  He recalled that there was a murder at the Tallahassee Mall and he stated, "basically, I heard that possibility of an inmate who had been on some kind of pre-release doings, doing some catering or something, escaped and committed a murder." T. Vol. VII at 969.  Mr. Marshall did not know what Petitioner had been incarcerated for previously and stated that he had not formed an opinion about the case and could put what he knew about the case aside and base his decision solely on what he heard in court.  Id. at 970.  Mr. Marshall did not have any religious or moral objections to the death penalty.  Id.  Mr. Marshall stated that he would not base his decision solely on mental illness evidence and that he could vote to recommend a sentence of death even if the defendant suffered from a mental illness if the aggravating circumstances outweighed the mitigating ones.  Id. at 974.

Upon examination by defense counsel, Mr. Marshall summarized his feelings about the death penalty as follows: "Well, I guess that my particular view of the death penalty would be it would depend on the particular situation and it depends on my view of whether or not the crime was committed and I would take each incident individually and try to evaluate it as I see it as to guilt."  Id. at 975.  He would rate himself in the middle of a one to ten scale regarding the death penalty.  Mr. Marshall had not thought about whether the death penalty is imposed fairly, but he did not believe that it discouraged people from committing murder.  Id. at 976.  He felt that he "would have to wait and see what the situation presents" when asked if he thought he would be more or less likely than the average juror to vote for death.  Id. at 977.  When told that the crime at issue was brutal, Mr. Marshall stated that he could still vote for life if the mitigating circumstances outweighed the aggravating ones.  Id. at 978.  When asked the set of hypotheticals, Mr. Marshall stated in every instance that he could vote for life if the mitigating circumstances outweighed the aggravating ones.  Id. at 979-80.  Finally, Mr. Marshall believed that the death penalty could be warranted for a minor, but

not for someone who is significantly mentally retarded.  <u>Id</u>. at 981.

e.     **Alternate Juror Michelle Holcomb**

When asked if she had any familiarity with the case, Ms. Holcomb stated that she works at Gayfers and was on her lunch break and out of the store at the time of the crime.  <u>Id</u>. at 1114.  She stated , "so the only thing I know was that there was a killing in the parking lot and I just heard someone outside say that this is the one that happened at the shopping center."  <u>Id</u>.  Ms. Holcomb said that she does not read the newspaper and does not usually watch television.  <u>Id</u>.  She did not know anything about Petitioner and did not know the victim, though she thought that she might recognize one of the store's security people, but she did not know any of the other possible witnesses mentioned by the prosecutor.  <u>Id</u>. at 1115.  When asked whether she had formed an opinion as to Petitioner's guilt, Ms. Holcomb responded that she did not have enough information to form an opinion.  <u>Id</u>.  She stated that morally she has "mixed feelings" about the death penalty in general.  <u>Id</u>.  In summarizing her feelings on the death penalty, Ms. Holcomb stated:

> I guess if it could be avoided at all, then I think it should be.  Say if there was a chance for rehabilitation or something of a prisoner, then I think that that would be much better than the death penalty.  I think I might have a difficult time maybe sentencing someone to death or being part of that, but I think if, say, the law required it, I think I could do it.  But that would be something that would be very hard to do.

<u>Id</u>. at 1116. Ms. Holcomb did express that if the aggravating circumstances outweighed the mitigating ones, she could follow the law and vote for death.  <u>Id</u>. at 1118.  She stated several times that she believed she could set aside her own feelings about the death penalty and follow the law.  <u>Id</u>.  She testified that she believed that mental illness should be considered as a factor, but not the only one.  <u>Id</u>. at 1121.

Upon examination by defense counsel, Ms. Holcomb stated she would consider herself a five or six on the ten point scale regarding the death penalty and reiterated, "I would prefer not having it, but it is necessary sometimes."  <u>Id</u>. at 1123-24.  She did not have enough information to give an opinion as to whether the death penalty is

imposed fairly, but does believe that the penalty deters murder.  Id. at 1125.  Because she does not know how other people feel about it, she is not sure where she would fall, but she might be less likely than the average person to vote to impose the death penalty.  Id. at 1126-27.  Ms. Holcomb stated she could vote for life if the mitigating circumstances outweighed the aggravating, and she maintained this opinion when asked the series of hypotheticals posed on this issue.  Id. at 1128-29.  Ms. Holcomb stated that her father died when she was ten years old, but she does not consider her childhood to have been difficult.  Id. at 1130.  Finally, she could not think of a circumstance in which the death penalty would be justified for a minor, but there "might be a case" in which someone who was "pretty dramatically impaired" might be sentenced to death.  Id.

f.    Alternate Juror Ruth Tadlock

Ms. Tadlock read newspaper accounts of the crime and related her knowledge as follows:

> It was a murder case in Tallahassee Mall parking lot near Gayfers Department Store.  The weapon was a knife and it was a lady around in her forties.  Faye Lamb, I believe was her name.  It happened during the summertime probably around June.  I have read an article about Mr. Dillbeck's background; that he was on a work release program and had escaped from a work detail serving at an elderly dinner in Quincy, somewhere in that area, I believe.  And when he escaped, he came to Tallahassee.

Id. at 1059.  Ms. Tadlock knew that Petitioner had murdered someone else previously and stated, "it sounds like to me that it was pretty conclusive that he was guilty."  Id. Ms. Tadlock had not formed an opinion about the appropriate penalty, however.  Id. at 1060.  She was concerned that she may need to justify a not guilty verdict to neighbors or friends.  Id.  When asked whether she could put out of her head what she knew about the case and start fresh, Ms. Tadlock responded, "[t]o be honest, I'm not sure." Id.  Ms. Tadlock stated that she did have scruples against the death penalty and explained her feelings as follows: "I feel like if I was the one that had to make the judgment myself, I could not say this person deserves to die and this one doesn't.  I,

as a person, couldn't make that judgment. But I feel like if the law requires it, that is not my personal feeling." <u>Id</u>. at 1062. Despite her personal feelings, Ms. Tadlock could vote to impose death if she felt the aggravators outweighed the mitigators. <u>Id</u>. at 1063. Ms. Tadlock was a nurse, but did not work in the mental health field. <u>Id</u>. at 1064. She believed that mental illness should be given some weight under certain circumstances, but stated that even if a defendant had a mental illness she could vote for death if the aggravating circumstances outweighed the mitigating ones. <u>Id</u>. at 1065, 1067.

Upon examination by defense counsel, Ms. Tadlock reiterated that she had a pretty firm belief that Petitioner was guilty, and she was not sure that she could set these beliefs aside. <u>Id</u>. at 1067-68. She again stated that she had not formed an opinion on an appropriate penalty. <u>Id</u>. at 1068. Ms. Tadlock stated that even knowing the crime was brutal, she could vote for life if the mitigating circumstances outweighed the aggravating ones. <u>Id</u>. at 1069. When asked the series of hypotheticals, Ms. Tadlock answered to each that she could vote for life if the mitigating circumstances outweighed the aggravating ones. <u>Id</u>. at 1070.

g.    <u>Juror Robert Ussery</u>

Mr. Ussery recounted his familiarity with the case as follows:

> I just recall that there was an inmate who walked off of a work release program, I think over in Gadsden County, and then a couple of days later a lady was killed in the Tallahassee Mall, I believe, was stabbed to death, and then the inmate was arrested, I don't know whether it was that day or a couple of days later.

T. Vol. VI at 861. Mr. Ussery believed that he could set aside what he knew and make a decision based on what he heard in the courtroom. <u>Id</u>. at 861. Mr. Ussery had no moral or religious scruples against the death penalty, and he could go to the penalty phase of the trial with an open mind. <u>Id</u>. at 863, 864. He characterized himself as a "middle-of-the-roader" when it came to his feelings about mental illness as a defense or as a mitigating factor. <u>Id</u>. at 866. Mr. Ussery believed that even if the defendant's mental illness had been established, he could vote for death if the aggravating factors outweighed the mitigating ones. <u>Id</u>. at 867.

On examination by defense counsel, Mr. Ussery summed up his feelings about the death penalty as follows:

> First of all, I do not have strong feelings about the death penalty one way or the other. I think certainly in the right circumstances, it is justified and should be carried out. There again, I have never sat on a jury where I had to make that decision. So, I'm just not sure. But, I do not have strong feelings one way or the other. I think I could follow the Judge's instructions.

Id. at 868. He rated himself a five on the ten-point death penalty scale. Id. at 869. When asked if the death penalty is imposed fairly, Mr. Ussery stated that he thought it was, but "every now and then you see something on Sixty Minutes or a national newspaper about it being wrongfully imposed. But, as far as I know, that is a rarity and the result of human frailties." Id. at 869-70. He does not believe the death penalty deters murders because the crime rate keeps going up. When asked if anything troubles him with the death penalty, Mr. Ussery stated, "[w]ell, not with the death penalty itself. My complaint is something we don't have any control over. Part of it is with the judicial system. Once it's imposed, it takes forever and ever and ever and millions of dollars to get it done." Id. at 870. Mr. Ussery believed that while he did not know, he might be maybe more likely than the average person to vote for death. Id. at 871. Even knowing that the crime at issue was brutal, he could vote for life if the mitigating circumstances outweighed the aggravating ones. Id. at 872. He reiterated that he believed he could follow the judge's instructions. Mr. Ussery answered yes to each hypothetical which asked if he could vote for life if the mitigating circumstances outweighed the aggravating ones. Id. at 872-73. Finally, he did not believe that the death penalty is warranted for a minor or for someone who is significantly mentally retarded. Id. at 874.

h.     Juror Cynthia Ann Porter

Ms. Porter testified that she heard about the case from friends discussing it, and she remembers that it involved "a lady killed at the Tallahassee Mall and the guy escaped from prison, or something like that." T. Vol. V at 742. She did not know what

Petitioner had been imprisoned for previously.  Ms. Porter stated that she could put aside what she had heard and make a decision based on what was presented in court. Id. at 742.  Ms. Porter had no moral or religious scruples against the death penalty.  Id. at 744.  Ms. Porter would be open to evidence of mental health, but could vote to impose death even if the defendant had a mental illness if the aggravating circumstances outweighed the mitigating ones.  Id. at 748, 749.

On examination by defense counsel, Ms. Porter rated herself a six on the ten-point scale and believed that the death penalty is imposed fairly.  Id. at 749, 750.  She believed that the death penalty deterred murder and that it could be justified in cases of rape.  Id. at 751.  When asked if anything bothered her about the death penalty, Ms. Porter responded:

> I would be not human if I didn't say–it's a human life.  I mean, the death penalty means somebody has got to die.  So, I can't say it doesn't bother me.  But, if the person is found guilty and that is their sentence, I believe in the death penalty.

Id. at 751.  She believed that she would "be there with the average person" in voting to impose death.  Id. at 752.  Ms. Porter answered yes to all of the hypotheticals posed by defense counsel and in every case stated that she could vote for life if the mitigating circumstances outweighed the aggravating ones.  Id. at 753-54.  Ms. Porter related that her father had had a problem with alcohol, but it was not a longstanding one.  Id. at 755.  Finally, Ms. Porter felt that the death penalty could be justified for minors and for a defendant who was significantly mentally retarded.  Id. at 756.

### i.    Juror Larry Davis

Mr. Davis testified about his knowledge of the case as follows: "[b]asically, the only thing I remember about it was a woman was killed in the parking lot by some man that I believe was on work release.  That's about all I can remember."  T. Vol. III at 429. Mr.  Davis had not formed an opinion as to Petitioner's guilt; he said, "I don't even know the guy" and believed that he could set aside his prior knowledge in making a decision about the case.  Id. at 430.  Mr. Davis had no moral or religious scruples

against the death penalty, and when asked whether he could deliberate a penalty phase with an open mind responded, "[y]es, I know I would, because there is a reason I guess that people do things and it is a terrible reason or something behind what action people do, you know." <u>Id</u>. at 433. Mr. Davis stated that he could envision that a mental illness would affect a person's behavior, but he didn't know much about mental illnesses. <u>Id</u>. at 435. Mr. Davis believed that he could recommend a death sentence if the aggravating circumstances outweighed the mitigating ones. <u>Id</u>. at 436.

On examination by defense counsel, Mr. Davis rated himself a five on the ten-point scale. <u>Id</u>. at 437. When asked if he felt the death penalty was imposed fairly, Mr. Davis replied, "[j]ust from what I hear about the death penalty and some things, it was one particular case that I heard about that I didn't feel like the man deserved it. Me personally, I didn't feel like he deserved it." <u>Id</u>. at 439. He does not believe that the death penalty discourages people from committing murder. <u>Id</u>. Mr. Davis stated that his problems with the penalty involve one case in which he did not feel the defendant deserved the sentence. He thought "[i]t didn't look like he was given a chance to prove his innocence. He got the death penalty anyway and he was executed." <u>Id</u>. at 440. When asked whether he would be more or less likely to vote for death than the average juror, Mr. Davis responded, "[a]gain, what we know, according to the circumstances. If somebody is going to just take someone's life for no reason at all, unprovoked, that person deserves the death penalty." <u>Id</u>. Mr. Davis felt that he could vote for life even knowing the crime at issue was brutal, and when posed the hypotheticals by defense counsel answered in each instance that he could vote for life if the mitigating circumstances outweighed the aggravating ones. <u>Id</u>. at 442-43. Finally, Mr. Davis felt that it would depend on the crime when considering whether the death penalty would be justified for minors, but he did not feel that someone significantly mentally retarded should be sentenced to death. <u>Id</u>. at 445.

j.   <u>Evidentiary Hearing</u>

Petitioner's trial counsel, Randy Murrell, testified at the evidentiary hearing that

his legal career had centered primarily on criminal defense work. He was employed with the public defender's office most of his career, having started practicing law in 1976. Evidentiary Hearing ("EH") Vol. IV at 614. Mr. Murrell had tried nineteen first-degree murder cases, was involved in more than that, and most of these were capital cases. Id. at 615-16. He testified that Petitioner's case was his only one which resulted in a death sentence. Id. at 616. When asked what defense strategy he decided to employ, Mr. Murrell testified:

> Well, it was pretty clear to me that Mr. Dillbeck was going to get convicted of first degree murder. I think there was some question about–my memory is we asked and got a special verdict form. And my hope was that maybe we could get felony murder as opposed to premeditated murder. But, you know, there was no real dispute about the facts so it was clear to me that there would be a first degree murder conviction. The hope was that we could convince a jury to recommend a life sentence.

Id. at 619. Mr. Murrell testified that he presented prospective jurors with the hypotheticals mentioned above, which was not his usual practice, because:

> I thought it was an important issue. And, you know, I felt like, I mean, I felt like a lot of people would be inclined to vote maybe automatically for death given the circumstances in the case. They would say that, you know, given those circumstances, I could never vote for life. And I wanted to know if that was the case and that's why I asked.

Id. at 629. Mr. Murrell stated that he utilized a score sheet when evaluating the suitability of prospective jurors, rating them on a scale of one to ten with ten being jurors who would be most favorable to Petitioner. Id. at 632. He stated he rated most of the prospective jurors below a five or a six so "five was a relatively decent rating." Id. at 636-37. Mr. Murrell then reviewed his notes from the jury selection; he did not have an independent recollection of much of the trial. Mr. Murrell rated the jurors at issue here as follows: Ms. Whitley, Mr. Zippay and Mr. Holcomb were rated 5; Ms. Krell was rated 4; Mr. Marshall was rated 6; and Ms. Tadlock was rated 7. See id. at 632, 633, 635, 637, 638 and 639. Specifically with regard to Ms. Tadlock, Mr. Murrell's notes indicated that while she knew about the case, she was morally opposed to the death penalty which was favorable to Petitioner. With regard to Ms. Holcomb, Mr. Murrell

stated his notes indicated that she did not know anything about the case even though she worked at Gayfers.  He further stated:

> I wasn't concerned about people knowing about the facts of the crime because that was all going to come out.  And all the reports I had seen, I mean, they were accurate.  They didn't distort the facts.  So this was all going to come out.  And that was not something I was overly concerned about.

Id. at 639-40.  Mr. Murrell also testified he had no memory of discussing juror strikes with Petitioner; however, he assumed that he did because it was typical for him to do so.  Id. at 640.  Mr. Murrell stated that while he would consider his client's input, it was his job to make the final decision  as to who would be challenged as jurors.  Id.

Petitioner testified at the evidentiary hearing that he was present during voir dire and he "vaguely" recalled Mr. Murrell addressing possible issues that were going to come up at trial.  Id. at 594.  He did not believe that they discussed the jury panel, but he "believe[d] I did question a couple people."  Id.  Petitioner could not recall who these prospective jurors were, but he believes that they were not accepted as jurors. Id.

The Sixth Amendment of the United States Constitution guarantees to a defendant the right to be tried by an impartial jury whose verdict is "based on evidence received in open court, not from outside sources. "  Sheppard v. Maxwell, 384 U.S. 333, 351, 86 S. Ct. 1507, 1516, 16 L. Ed. 2d 600 (1966). The failure to give an accused a fair hearing violates standards of due process.  Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642, 6 L. Ed. 2d 751 (1961).  However, due process does not require that qualified jurors be totally ignorant of the facts and issues involved in a case.  See Murphy v. Florida, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975).  As stated in Irvin v. Dowd, supra, 366 U.S. at 723, 81 S. Ct. at 1642-43:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on evidence presented

in court.

In this case, the trial court conducted an individualized examination of the prospective jurors, which is the preferred approach when it is possible that the venire has been exposed to pretrial publicity.  See Cummings v. Duggar, 862 F.2d 1504, 1508 (11th Cir. 1989).  Mr. Zippay was the only juror who expressed an opinion as to Petitioner's guilt, and he testified that he had formed no opinion as to the appropriate sentence to impose.  He also clearly stated that he could vote for life if the mitigating circumstances outweighed the aggravating ones.  T. Vol. VI at 800.  Because Mr. Murrell's trial strategy involved conceding that Petitioner committed the murder, Mr. Zippay's opinion that Petitioner was guilty did not violate Petitioner' fair trial rights.

All of the jurors complained about by Petitioner stated they could base their decision on the evidence presented in court and could vote for life if the mitigating circumstances outweighed the aggravating ones.  The postconviction court found "each of [the jurors] testified  that they could lay aside anything they heard outside of the court and decide the case based solely upon the evidence they heard in court." Findings of Facts and Conclusions of Law, EH Vol. V, Tab II at 3.  Therefore, Petitioner has not demonstrated that any of the jurors who served on his jury were constitutionally infirm.  See Irvin v. Dowd, supra.  The postconviction court also noted:

> Ms. Whitley and Ms. Krell for instance both stated they were probably less likely than the average person to vote for a death sentence.  Both Ms. Holcomb and Ms. Tadlock had scruples against imposition of the death penalty.   Mr. Marshall and Mr. Zippay, though more middle of the road than jurors Whitley and Krell, had no difficulty in considering a life sentence even in the face of trial counsel's aggravated murder hypotheticals.  Likewise, jurors Ussery, Porter, and Davis expressed no reservations about recommending a life sentence if the mitigating circumstances warranted such a recommendation. This Court concludes that not attempting to strike these jurors was reasonable trial strategy.

Id. at 3-4.

A review of the record supports the state court's conclusion that Petitioner did not receive ineffective assistance of counsel when Mr. Murrell did not challenge these

jurors for cause.  Given the evidence of Petitioner's guilt, defense counsel determined his best defense would be to argue that the murder was not premeditated and find jurors who would be inclined to vote for life instead of death if convinced that the mitigating circumstances outweighed the aggravating ones.  Because Mr. Murrell was an experienced trial attorney, the presumption that his conduct was reasonable is strong.  See Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000)("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.").  Mr. Murrell's focus during voir dire was to find jurors who would be receptive to mental health issues and difficult childhoods, key components of his penalty phase case.   Petitioner has not demonstrated that this defense strategy was unreasonable or was a strategy that no competent counsel would have employed.

Evaluating the reasonableness of counsel's performance from his perspective at the time, the court finds counsel's performance was reasonable.  This conclusion is further supported by the fact that the jury voted eight to four to impose death so at least four jurors found that the mitigating circumstances outweighed the aggravating ones.   Additionally, Petitioner has not proposed another strategy that he believes should have been employed.  Since Petitioner has failed to meet the first prong of Strickland, the second prong of the analysis, whether Petitioner was prejudiced, need not be addressed.  See Strickland, 466 U.S. at 697.

The state court's factual findings are supported by the record and must be given deference by this court.  Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence.   Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent.  Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly

established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**Ground III: Ineffective Assistance of Counsel–Concession of Aggravating Circumstances**

Petitioner contends that he received ineffective assistance of counsel when his trial counsel allegedly conceded the heinous, atrocious, or cruel ("HAC") aggravating circumstance during voir dire, opening statement and closing statement. Doc. 12 at 16.

**1. State Court Proceedings**

Petitioner raised this issue in his amended motion for postconviction relief. The postconviction court denied relief, and the Florida Supreme Court affirmed this denial. The supreme court quoted the postconviction order as follows:

> Dillbeck asserts his counsel was ineffective for conceding the HAC aggravator. Dillbeck claims that when his trial counsel described the murder as "brutal" this was conceding the heinous, atrocious and cruel aggravator. However, describing the murder as "brutal" is not conceding the heinous, atrocious and cruel aggravator when trial counsel is attempting to argue to the jury that even a terrible murder could result in a life sentence.
>
> During jury selection, trial counsel referred to the crime as "brutal" and "terrible" to prospective jurors. During opening statements of [the] guilt phase, trial counsel, said that he was sure the State will do a very good job of convincing you that this was a "terrible, brutal crime." After describing what Dillbeck's testimony would be, trial counsel told the jury you will get to see very graphically what he did and it is a terrible, brutal thing. Trial counsel noted that "The State, I'm sure, will show you in graphic detail the brutality of this crime, You will see some terrible photographs. You will hear some terrible details, but I think you'll soon see that the very brutality of this crime shows you what sort of state he was in. This wasn't some kind of calculated, planned act. It is the kind of brutality you will see in a frenzy, someone that's in a rage, someone who has simply lost control."

In his initial closing of [the] guilt phase, trial counsel admitted this was "a terrible, terrible crime" and there are "not enough words to express the horrible nature of what he did." Trial counsel, in support of his argument that the defendant was telling the truth in his trial testimony, coming "back to the brutality, the intensity of the assault" noted that "they have some terrible pictures here in evidence," but the very intensity of the attack shows it was the kind of attack that would occur if the fellow was in a "frenzy, a rage." Trial counsel observed: "he's committed some terrible crimes here but clearly the State has not proven that it was a premeditated killing."

During [the] penalty phase, the prosecutor, in his opening, urged the jury to find the HAC aggravator based on the pain involved and the length of time it took to die. Trial counsel, in his opening in [the] penalty phase, said: "my client is worthy of mercy" and "you should let him live." Trial counsel told the jury that he was going to review Dillbeck's life with them and they would hear a lot of details and "a lot of it is going to be bad." Trial counsel acknowledged that "my client has done some terrible, terrible things during the course of his life." Trial counsel noted that the Indiana crime was "chillingly similar to this murder." Trial counsel acknowledged by the age of fifteen Dillbeck had "caused a great deal of pain and damage." Trial counsel explained that Dillbeck suffers from Fetal Alcohol Syndrome which resulted in brain damage. Trial counsel also discussed child abuse during Dillbeck's childhood and his father abandoning him. Trial counsel referred to Dillbeck using drugs including the fact that Dillbeck was taking speed when he stabbed the victim in Indiana. Trial counsel ended his opening with "you will see that he is deserving of mercy" and " he should be permitted to live." In his closing at [the] penalty phase, trial counsel stated that life is the only fair resolution. Trial counsel repeatedly asked for mercy. Trial counsel, as part of his discussion against finding the HAC aggravator, told the jury that he had said all along that it was a brutal killing. Trial counsel argued that Dillbeck did not "decide this would be a good way to torture somebody." Trial counsel also argued against the HAC aggravator by pointing out, based on the pathologist's testimony, the victim had mercifully died quickly. He asked the jury to focus on the definition of HAC

which required "some special intent to inflict a particularly tortuous sort of death." Trial counsel stated that the mitigating evidence showed the reasons that Dillbeck caused this pain and wasted his life. He argued that the mitigation made these "senseless crimes" make sense and "the reason he has done these terrible things is because he is damaged and he's mentally ill." Trial counsel ended [the] penalty phase with the statement that he had committed some terrible crimes but he is entitled to mercy and then urged the jury to vote for life and let him live.

(Record citations omitted.)

At the postconviction evidentiary hearing, trial counsel denied that his description of the murder as brutal was a concession of the HAC aggravator. As summarized by the trial court in its order:

Trial counsel testified at the evidentiary hearing that while he admitted the killing was brutal, he did not concede the HAC aggravator. He argued that the murder was not heinous, atrocious and cruel. While he thought that the jury would find the HAC aggravator, he argued that the State had not proven it. He knew that the State would be seeking the HAC aggravator. He gave the prospective jurors a series of hypotheticals during jury selection because he thought that some jurors would, given the circumstances of the crime, could never vote for life, which he wished to know and excuse those jurors. He also wanted the jurors to understand even a "terrible," "horrible" murder could still result in a life sentence. Trial counsel described the crime as brutal during voir dire because he thought it was best to confront difficult issues as soon as possible.

(Record citations omitted.)

In denying this claim, the postconviction trial court found that Dillbeck failed to prove both prongs of the Strickland standard. According to the trial court, "counsel did not concede to the HAC aggravator" by describing the crime as "brutal." The court found that it was reasonable trial strategy to confront difficult issues rather than ignore them. Further, the court found no prejudice because the jury would have considered the

murder to be heinous, atrocious, or cruel without counsel's description of the murder as brutal. Also, the court agreed with the State's contention that the jury would have recommended death regardless of the HAC aggravator based on the four remaining aggravators, which included a prior conviction for the murder of a law enforcement officer.[FN4]

> FN4. The four remaining aggravating factors were: (1) Dillbeck committed the murder while under a sentence of imprisonment; (2) Dillbeck had been previously convicted of another capital felony; (3) the murder was committed during the course of a robbery and burglary; and (4) the murder was committed to avoid arrest or effect escape.

We agree with the trial court's conclusion that Dillbeck has failed to establish either prong of the <u>Strickland</u> analysis in this claim. The presumption that counsel's decision to refer to the murder as brutal might be considered sound trial strategy has clearly not been overcome. <u>See</u> <u>Brown v. State</u>, 846 So.2d 1114, 1125 (Fla.2003); <u>Atwater v. State</u>, 788 So.2d 223, 230 (Fla.2001). Dillbeck's trial counsel did not render deficient performance in this regard. <u>See</u> <u>Brown</u>, 846 So.2d at 1125. Counsel reasonably sought to soften the impact of the evidence the State would introduce by conceding that the crime was brutal in order to prepare the jury for it. <u>See id.</u> (finding defense counsel's reference to victim "gurgling" on his own blood was a reasonable trial tactic seeking to dilute some of the damaging testimony the jury would later hear). Moreover, given the four remaining aggravators (including murder of a law enforcement officer) and few minor mitigators, Dillbeck has not demonstrated prejudice from the alleged deficiency under the <u>Strickland</u> standard.

<u>Dillbeck III</u>, 964 So.2d at 99-101.

    2.    Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel are set forth <u>supra</u>. The Florida Supreme Court cited <u>Strickland</u> as the legal standard for analyzing claims of ineffective assistance of counsel and applied those standards to the facts of Petitioner's claims.  <u>Dillbeck III</u>, 964 So.2d at 98-99.  Therefore, the state court applied the correct legal rule based on Supreme Court precedent.  The remaining issue is thus whether the state court's denial of Petitioner's claim resulted in an

unreasonable application of <u>Strickland</u>.

  3.  Federal Review of Claim

  The record reflects that during voir dire Mr. Murrell told each prospective juror that the crime committed by Petitioner was brutal.  During the evidentiary hearing Mr. Murrell was asked by state prosecutor, Mr. Evans, why he addressed the brutality of the murder during voir dire, and the following exchange occurred:

  A.  Well, like a lot of things, I think the best strategy is to confront these difficult issues as soon as possible.

  Q.  And this was going to be an issue for–how was– how was the murder described to you?

  A.  Well, it was a stabbing, and the woman had been stabbed a number of times.

  Q.  And did she expire immediately or was it after some struggle?

  A.  Here again, I don't have much of a memory, I remember reading it, going over in the transcript Dr. Wood's testimony.  I mean, there was a struggle, there was a struggle.  But I think she died fairly quickly, but there was a struggle.

  Q.  And did you concede the heinous, atrocious, and cruel [aggravator]?

  A.  Here again, I certainly would not want to stand by my memory independently.  I went back and read over the transcript.  And my reading of the transcript, which anyone else can do as well, is that I described the murder as a brutal murder.  But that if you read the penalty argument, I didn't concede heinous, atrocious, and cruel.

  Q.  And you in fact argued that it was not heinous, atrocious, and cruel?

A.      Right. I don't think it was–I would not say that was the major focus of my argument, I sort of thought that the jury would find that aggravating circumstance, but I made an argument that the State had not proven HAC.

Q.      And is it–again, let's touch back onto issues that you thought you needed to deal with during jury selection. And that was you needed to bring out the facts that you knew this was going to be an aggravator the State was going to seek.

A.      I'm sorry?

Q.      You knew or at least had a pretty good idea the State was going to be trying, is going to be arguing heinous, atrocious, and cruel?

A.      I knew that, sure.

Q.      And you decided to deal with that during jury selection?

A.      Right. You know, I did something unusual here that I hadn't done before but I gave them a series of hypothetical questions. And I don't know that I had done that on other occasions. But, yes, I addressed that during voir dire.

Q.      Why did you feel it necessary to address it during voir dire?

A.      I thought it was an important issue. And, you know, I felt like, I mean, I felt like a lot of people would be inclined to vote maybe automatically for death given the circumstances in the case. They would say that, you know, given those circumstances, I could never vote for life. And I wanted to know if that was the case and that's why I asked.

Q.      And did that–or do you recall if that elicited any responses from jurors that were later struck because they had indicated that, you know, heinous, atrocious, and cruel, if death occurred, that they

would impose the death penalty?

A.      I have no independent memory.  Looking over the transcript, by and large most of them would finally come around and say, yes, I could.

And I might say there was sort of an educational benefit of it, too. I wanted jurors to understand that even a terrible murder, a horrible murder could still result in a life sentence.  And by giving hypotheticals  it conveyed that information.  I saw a lot of people were excused.  There were a few that said they could not vote for life.   I don't know if that was in response to any of the hypotheticals, but there were certainly some that said that.

EH Vol. IV at 627-630.

In Mr. Murrell's opening statement during the guilt phase of the trial, he also acknowledged that the crime was a "terrible, brutal thing" and that while Petitioner did commit the crime, it was not premeditated.  T. Vol. XI at 1643.  This point is illustrated by the following:

The State, I'm sure, will show you in graphic detail the brutality of this crime.  You will see some terrible photographs.  You will hear some terrible details, but I think you'll soon see that the very brutality of this crime shows you what sort of state he was in.  This wasn't some kind of calculated, planned act.  It is the kind of brutality you will see in a frenzy, in someone that's in a rage, someone who has simply lost control.  So, as bad as those photographs may be, I think they will show you what his state was.  He was in a rage.  He was in a panic.  He wasn't reflecting on anything.

T. Vol. XI at 1645.  Mr. Murrell also repeatedly emphasized in his guilt phase closing argument and reply that Petitioner did not reflect on his actions.  For example, Mr. Murrell explains Petitioner's actions as follows:

He's been in prison over 11 years and he escaped from custody.  The trepidation, the excitement, the fear that must have been visited upon him when he escaped must have been tremendous.  Since he was 15 years old, he's been locked up.  He has a plan, but the plan is not working out. To start with, he's on the run.  He's not getting much to eat, not having much to drink.  He's not getting any sleep.  His estimate was three or four hours of sleep in close to three days, certainly more than two and a half

days.  He says he didn't have much to drink.  He was on edge.  He had a
plan, but as I said, the plan wasn't working.  He said he tried to call this
fellow 20 times.  After about ten times, he got the knife, thinking that he
might need to use it.  But it just wasn't going well.  He was on edge.

And so he gets to the car and he thinks yes, Mrs. Vann is the kind of
person that would give him a ride.  But, here again, it just doesn't work
out.  She starts to honk the horn.  He tries to stop her from doing it.  The
next thing he knows he's in the car, but she's got a hold of his hair.  She
bites him and out of fear, out of rage, out of panic, he starts battering
away.  And that is not to say that there is an excuse for any of this or any
of it is justified.  Of course it is not.  But, it goes to show you that he
wasn't thinking. He was on the edge.  He was ready to lose it and he did.
It makes perfectly good sense, particularly when you think about the rest
of the evidence in the case.

T. Vol. XIII at 2046-47.

During his opening argument in the penalty  phase of Petitioner's trial, Mr.
Murrell commented as follows:

I will show you during the next couple of days that my client is worthy of
some mercy, that you should let him live.  And I'm going to do it by trying
to make some sense out of this wasted life of Donald Dillbeck that has
caused so much pain to so many people.

What I'm going to do is to review his life with you.  And you will hear a lot
of details.  And a lot of it is going to be bad.  My client has done some
terrible, terrible things during the course of his life.  The bad things start
when he's fifteen years old. . . .

T. Vol. XIV at 2171.  Finally, during the closing argument in the penalty phase, Mr.
Murrell specifically argued that the State had not proven the HAC aggravator beyond
a reasonable doubt:

The other particularly heavy aggravating circumstance I would suggest
is the fact that there is a prior–the nature of this killing.  Mr. Kirwin says
it was heinous, atrocious and cruel.  I have said all along to you yes
indeed it was a brutal killing.  But I asked you to look at that definition of
heinous, atrocious and cruel.

And remember, this must be proved beyond a reasonable doubt. Yes, it was [a] brutal attack. An attack fortunately that did not last long. You heard what Dr. –the pathologist, Dr. Wood said. Mercifully she died quickly. And I think, too, if you read that instruction you will see that it seems to say that there must be some special intent to inflict a particularly tortuous sort of death.

All I'm saying is it wasn't calculated. I've said this all along. It was a spontaneous act. It wasn't–he didn't think it through and decide this would be a good way to torture somebody. So yes, it's a brutal killing, but I ask you to look closely to see if that particular aggravating circumstance were proven beyond a reasonable doubt.

T. Vol. XVII at 2717-18. The record clearly shows that Mr. Murrell argued that the State had not proven the HAC aggravator beyond a reasonable doubt, and his acknowledgment that the crime was brutal was not in effect such a concession.

The right to effective assistance of counsel extends to closing arguments. See Bell v. Cone, 535 U.S. 685, 701-702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); Herring v. New York, 422 U.S. 853, 865, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975). Trial counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Therefore, judicial review of a defense attorney's summation is "highly deferential-and doubly deferential when it is conducted through the lens of federal habeas." Yarborough v. Gentry, 540 U.S. 1, 6, 124 S. Ct. 1, 4, 157 L. Ed. 2d 1 (2003) (per curiam).

In Yarborough, the Supreme Court dealt with a claim of ineffective assistance of counsel based on several comments made by defense counsel in his closing argument. The Court noted that the Ninth Circuit Court of Appeals had criticized defense counsel's presentation including his mentioning "'a host of details that hurt his client's position, none of which mattered as a matter of law.'" Id. at 9 (citation omitted). The Court stated:

Of course the reason counsel mentioned those details was precisely to

remind the jury that they were legally irrelevant. That was not an unreasonable tactic. See F. Bailey & H. Rothblatt, Successful Techniques for Criminal Trials § 19:23, p. 461 (2d ed. 1985) ("Face up to [the defendant's] defects ... [and] call upon the jury to disregard everything not connected to the crime with which he is charged"). The Ninth Circuit singled out for censure counsel's argument that the jury must acquit if Gentry was telling the truth, even though he was a "bad person, lousy drug addict, stinking thief, jail bird." See 320 F.3d, at 900. It apparently viewed the remark as a gratuitous swipe at Gentry's character. While confessing a client's shortcomings might remind the jury of facts they otherwise would have forgotten, it might also convince them to put aside facts they would have remembered in any event. This is precisely the sort of calculated risk that lies at the heart of an advocate's discretion. By candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case. See J. Stein, Closing Argument § 204, p. 10 (1992-1996) ("[I]f you make certain concessions showing that you are earnestly in search of the truth, then your comments on matters that are in dispute will be received without the usual apprehension surrounding the remarks of an advocate").

Yarborough v. Gentry, 540 U.S. at 9-10.

In Petitioner's case, Mr. Murrell testified that he told the jury that the crime was terrible and brutal in order to maintain credibility with the jury because he believed that the jury would find the crime terrible and brutal. Mr. Murrell testified at the evidentiary hearing about why one would concede certain issues at times during a trial:

[Murrell]: Well, I think it improves your chances of success. I think if you argue things that are implausible or not very believable to the jury, I think that, you know, you weaken your ability to convince them of what's really important in the case.

[Evans for the State]: And so this was one of the reasons you employed the strategy that you did in this particular case?

[Murrell]: I thought it would be the most successful.

[Evans]: And is conceding certain issues in a case in order to maintain your credibility and to maybe get the jury to go along with you on some of the issues that you are contesting something that in your experience, that other lawyers do as well?

> [Murrell]: Right.  But, I mean, it is even more basic than that.  You know, in conversations with people if you are trying to convince somebody of something, you don't stand up there and claim things that are patently false or wrong.  It just doesn't make much sense to me to do it any other way.

EH Vol. IV at 621-22.   The focus of the defense was that the crime was not premeditated, and specifically with regard to the HAC aggravator, that Ms. Vann did not suffer.  Mr. Murrell's confronting these facts in a straightforward way is not equivalent to conceding the HAC aggravator.  As noted by the Court in <u>Yarborough</u>, 540 U.S. at 11:

> Winning over an audience by empathy is a technique that dates back to Aristotle. See P. Lagarias, Effective Closing Argument §§ 2.05-2.06, pp. 99-101 (1989) (citing Aristotle's Rhetoric for the point that "[a] speech should indicate to the audience that the speaker shares the attitudes of the listener, so that, in turn, the listener will respond positively to the views of the speaker"); id., § 3.03, at 112 (deriving from this principle the advice that "counsel may couch his arguments in terms of 'we,' rather than 'you, the jury' ").

> Furthermore, the Court noted in <u>Florida v. Nixon</u>, 543 U.S. 175, 191, 125 S. Ct. 551, 562, 160 L. Ed. 2d 565 (2004), that attorneys representing capital defendants "face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear."  Often the reasonable course is to focus on trying to persuade a jury to spare his client's life.  The Court elaborated:

> In this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in "a useless charade." <u>See</u> <u>Cronic</u>, 466 U.S., at 656-657, n. 19, 104 S.Ct. 2039. Renowned advocate Clarence Darrow, we note, famously employed a similar strategy as counsel for the youthful, cold-blooded killers Richard Loeb and Nathan Leopold. Imploring the judge to spare the boys' lives, Darrow declared: "I do not know how much salvage there is in these two boys. ... I will be honest with this court as I have tried to be from the beginning. I know that these boys are not fit to be at large." Attorney for the Damned: Clarence Darrow in the Courtroom 84 (A. Weinberg ed.1989); see Tr. of Oral Arg. 40-41 (Darrow's clients "did not expressly consent to what he did. But he saved their lives."); cf. <u>Yarborough v. Gentry</u>, 540 U.S. 1, 9-10, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003) (<u>per curiam</u>).

> To summarize, in a capital case, counsel must consider in conjunction

**both the guilt and penalty phases in determining how best to proceed. When counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent. Instead, if counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the <u>Strickland</u> standard, that is the end of the matter; no tenable claim of ineffective assistance would remain.**

<u>Nixon</u>, 543 U.S. at 191-192. <u>See</u> <u>Smith v. Spisak</u>, ___ S. Ct. ___, 2010 WL 86341 (Jan. 12, 2010)(counsel's disparaging comments in penalty phase closing argument portraying client as "sick," "twisted," and "demented" were not sufficient to establish prejudice prong of <u>Strickland</u> given nature of the case and counsel's explicit appeal for mercy). <u>See</u> <u>also</u> <u>Windom v. Sec'y Dep't. of Corr.</u>, 578 F.3d 1227, 1251 (counsel's candid comments in his penalty phase opening and closing arguments acknowledging brutality of crime and that client was not deserving of pity was not deficient performance when counsel affirmatively argued existence of statutory mitigating circumstances).

Under the first prong of the <u>Strickland</u> analysis, Petitioner must show that no competent counsel would have taken the action that his counsel took. Based on the state court record, this court cannot conclude that counsel's performance was not "reasonable considering all the circumstances" or that counsel committed "serious derelictions" of his duty. <u>Stano v. Dugger</u>, 921 F.2d 1125, 1150-51 (11th Cir. 1991). A review of Mr. Murrell's guilt and penalty phase opening and closing statements demonstrates that he was emphasizing to the jury that while the stabbing of Ms. Vann was terrible and brutal, Petitioner did not plan this murder nor did he seek to prolong her death. In crafting his defense, Mr. Murrell had to confront the facts and evidence as they existed. In both his opening and closing arguments in the guilt phase of the trial, Mr. Murrell focused primarily on the premeditation element of the offense and reinforced the defense strategy that there was no plan to kill, just a set of circumstances that led to an unfortunate tragedy; that this crime was the product of a fit of rage.

The state court found trial counsel's strategy to confront the difficult issues in this case reasonable and that defense counsel did not concede the HAC aggravator in this case. The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.[7]

**Ground IV: Ineffective Assistance of Counsel–Introduction of Criminal History**

Petitioner contends that his trial counsel introduced evidence of numerous criminal offenses which he had not been charged with or convicted of during the penalty phase of his trial. Petitioner argues that by presenting this evidence his attorney exposed the jury to otherwise impermissible aggravating circumstances which prejudiced the outcome of his penalty phase and resulted in the jury's recommendation for death. Doc. 12 at 19-21.

**1. State Court Proceedings**

Petitioner raised this issue in his amended motion for postconviction relief. The postconviction court denied relief, and the Florida Supreme Court affirmed, holding as follows:

> On remand, the postconviction trial court made the following findings, which are supported by competent, substantial evidence:
>
> > Dillbeck testified at the evidentiary hearing that he did not

---

[7]Because Petitioner has failed to establish deficient performance, this court will not address the prejudice prong of Strickland other than to note that Petitioner's death sentence is supported by four additional aggravators which is significant in undermining any claim of prejudice pursuant to Strickland.

consent to trial counsel admitting evidence relating to other crimes. Dillbeck admitted that none of the evidence relating to his past crimes was inaccurate. Dillbeck testified that he thought that it was unreasonable for trial counsel to introduce his past criminal conduct first in an attempt at a preemptive strike because that was the State's job. Dillbeck opined that the State would not have been able to introduce some of the evidence because it was not admissible. He acknowledged that his prior arrest record was a matter of public record. Dillbeck described his prior criminal arrests that did not result in convictions. He noted that trial counsel discussed these arrests in the penalty phase.

Trial counsel testified that he thought that the crime in Indiana was admissible because it was the motive for the murder of the deputy sheriff which he was going to put in issue. Dillbeck was fleeing from the stabbing in Indiana when he shot the deputy. The State had already videotaped the stabbing victim prior to the trial to admit during the penalty phase. He thought it was "better for us to own up to it" and address it than to have it come in as a revelation introduced by the State. He thought this evidence was admissible because he was going to open the door to it by going into the question of why he shot the deputy, which would make the evidence that he was fleeing to Florida from an Indiana crime admissible. Also, trial counsel was attempting to present as mitigating evidence that Dillbeck had a good prison record and had behaved in prison and that he was not a threat to others so long as he was in prison which he knew the State would attempt to rebut. He explained that, by the defense presenting evidence that he was a good inmate, it opened the door to the State presenting prior incidents in prison. The State already had Dillbeck's prison records. What had happened in prison was "not a secret." He wanted to address those things before the State revealed them to undercut his argument that Dillbeck was a good prisoner. Trial counsel would not have admitted this information if he did not think that it was admissible by the State. He explained that by introducing mitigating evidence, he had to accept some "not so favorable" rebuttal evidence by the State. Trial counsel thought that because his

mitigation was going to open the door to this rebuttal evidence by the State, it was better to reveal the damaging rebuttal evidence himself than to have the State do it.

This Court finds Mr. Murrell's testimony to be credible. This Court finds that counsel's decision to present mitigation, although it necessarily opened the door for the State to attempt to rebut that mitigation, was a reasonable trial strategy and thus counsel was not ineffective.

(Record citations omitted.)

We agree with the trial court that counsel made a reasonable, strategic decision to present this evidence. Counsel knew that introducing the mental mitigation and the model prisoner mitigation would open the door for the State to introduce evidence of a prior stabbing in Indiana, an escape attempt, and the stabbing of another inmate. Yet the only mitigation available was the mental mitigation and model prisoner mitigation, and counsel reasonably believed that the jury would be more likely to recommend death if the defense introduced no mitigation at all. Thus, despite its risk, we cannot say that trial counsel's decision to introduce this evidence was "outside the broad range of reasonably competent performance under prevailing professional standards." Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). It was reasonable for trial counsel himself to disclose the prior bad acts to soften or deflect the negative impact of the prejudicial evidence he knew the State would present. Accordingly, we affirm the postconviction trial court's conclusion that Dillbeck failed to show deficient performance by counsel for introducing details of his previous criminal activity to the jury during the penalty phase.

Dillbeck III, 964 S.2d at 105-06.

2.      Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel are set forth supra. The Florida Supreme Court cited Strickland as the legal standard for analyzing claims of ineffective assistance of counsel and applied those standards to the facts of Petitioner's claims. Dillbeck III, 964 So.2d at 98-99. Therefore, the state

court applied the correct legal rule based on Supreme Court precedent.  The remaining issue is thus whether the state court's denial of Petitioner's claim resulted in an unreasonable application of <u>Strickland</u>.

### 3.     Federal Review of Claim

Mr. Murrell addressed the prior crimes in his penalty phase opening statement as follows:

> When he was fifteen years old in Indiana he stabbed a fellow, an incident chillingly similar to the one you heard about at the trial.  You're going to find out that he was in a car and he was trying to take a CB radio.  It was at night, the fellow came up to the car and caught him in the act and grabbed him by the arm and started to lead Donald away from the car.  And for no apparent reason, Donald had a knife and he stabbed the fellow.  And Donald ran, got away.

> That fellow, Donald will tell you, was in the hospital a couple of weeks.  He even heard about the fellow getting out.  But about that time, Donald realized that the police had just about figured he was the one that committed the crime so Donald stole a car and he drove all the way to Florida, fifteen years old.  He didn't get any sleep and he found himself in Fort Myers.

> Here again, you're going to notice some similarities between the various crimes.  Much like the one here in Tallahassee, he was without sleep.  He got down there in Fort Myers and he had parked on the beach.  He was going to sleep there by the beach and an officer came up to him, just asked him what he was doing there, and asked for some identification and eventually the officer found a small quantity of marijuana there in the car, and he was about to arrest Donald and Donald ran.

> He got maybe twenty to twenty-five yards, thirty yards and the officer tackled Donald.  Donald is fifteen years old and he weighs about 130 pounds.  The officer is much bigger, two hundred pounds, six feet tall.  And the officer gets on top of Donald and sort of straddles him and says something like, "Don't make me hurt you."  The gun was right in front of Donald and he grabbed the gun.  It was in the holster.  He grabbed it out of the holster and fired twice.  He killed the deputy.  He was arrested a

short time later.

Donald will tell you that much like this crime here in Tallahassee, it was one that happened spontaneously, almost instantly. And there will be corroboration of that fact. There will be testimony that the wounds suffered by the deputy were what we might call contact wounds, in other words, the muzzle was in close proximity to the deputy as if it was a struggle and that's what you would expect. I think you will see that.

You will find that the shots were fired in rapid succession, just as they might have been if a struggle was going on. And you will find, too, that on Donald's face, after he was arrested, was powder burns and pieces of metal that will show that when the bullet passed his face, passed Donald's face, it was only a few inches away, which is the kind of thing you would expect if it was a struggle.

So again, I think you will see that's what it was, it was a struggle, but at the age of fifteen he caused a great deal of pain, a great deal of damage. And so he went to prison when he was fifteen years old. And there's more. You're going to find out that after he had been there a few years, in 1983, he made an escape attempt. Wasn't much of an attempt. He jumped a fence and got caught in something called ribbon wire. It's a form of barbwire. And he was pulled off the fence and that was the end of it.

But you will find, too, that when he was in prison in 1984, and what I would suggest was self-defense, he stabbed an inmate. Apparently the injuries weren't serious but he did that as well. So how do you make sense out of all of this? Well I think you will see.

There's going to be some curious things you're going to find out about Donald Dillbeck, my client. You're going to find out that while he was in prison for eleven years, he had been a good inmate. There will be some progress reports introduced that talk about how he was a good influence on other inmates.

You will see in many of the categories in which he is graded he was outstanding, good work. He certainly is not a discipline problem. When

you're in prison and you get into trouble while you're in prison you get something called a DR, a disciplinary report.  You will find in the eleven years in prison, he had two DR's.

I will have a classification officer come in that's an officer from the correctional facilities and he will tell you that he reviewed Donald's record and he will tell you in his view it's pretty remarkable that someone in prison when he was only sixteen has only had two disciplinary reports.

You will find out something else, too.  You will find out that when Donald stabbed that fellow in Indiana, he had never done anything violent before in his life.  Never hurt anyone, never threatened anyone with a weapon.  Never prior to that time had he hurt anyone.  And yet in a span of a week, he stabbed one fellow–or two weeks, stabs one fellow and kills a police officer.

You will see that there are certain similarities between all these crimes.  I think you can see it already.  These are not–with the exception of the incident in prison.  I think you will see that's not like these other ones.  But as far as the stabbing, as far as the shooting of the police officer, as far as the killing of Ms. Vann, you will see that these are spontaneous sort of things, they're not calculated, they're not thought through.

And so you will see they show extremely poor judgment, extreme over reactions.  They simply don't make much sense.  Well you will find that there's a reason for all of this.  The reason is a birth defect.  It's not the kind of defect that we're typically familiar with.  It's not something you can see.  But it's a birth defect.  It's damage to his brain.  It's damage that took place when his mother drank three to four six-packs a day throughout the course of her pregnancy.  It's brain damage.

T. Vol. XIV at  2175-76.   Mr. Murrell reviewed the testimony that the jury would hear from his medical experts explaining that Petitioner was suffering from Fetal Alcohol Syndrome or Fetal Alcohol Effect and as a result of this condition when  under stress Petitioner "shows poor judgment," "act[s] impulsively," "grossly overreact[s]," and is "prone to explode." Id. at 2178, 2179.   Mr. Murrell then presented a thorough penalty phase case with fifteen witnesses, including testimony by Petitioner who discussed

the murder of Mrs. Vann and some of his prior criminal activities.  See T. Vol. XIV-XVII.

A review of the record demonstrates that Mr. Murrell centered his penalty phase case on the presentation of mental health and model prisoner mitigating evidence.  Mr. Murrell presented three medical experts and other lay witnesses to support the mental health mitigation which he hoped would help explain Mrs. Vann's murder.  Mr. Murrell testified that he thought that the prior violent felony conviction aggravator (i.e., the killing of the sheriff's deputy in Ft. Myers) was the most serious, so he addressed the circumstances of the stabbing in Indiana which led to the deputy's murder as well as the details of the murder to explain Petitioner's behavior during these offenses in an effort to soften their impact.  His argument was that the stabbing in Indiana, the deputy's murder and Mrs. Vann's murder were spontaneous, impulsive acts which resulted when Petitioner felt threatened, not premeditated acts of violence.  Additionally, by making comparisons between the two murders, he hoped to further his mental health mitigation case as to Mrs. Vann's murder.   Incidental to the discussion of the stabbing and the murder of the sheriff's deputy, other criminal activities were discussed.[8]

Mr. Murrell explained his reasons for addressing Petitioner's previous crimes and criminal activity when questioned by state prosecutor Evans during the evidentiary hearing as follows:

> A.     As far as the crimes that led up to the shooting of the police officer, you know, it seems to me the inquiry was, why did he shoot the police officer.  And my argument was, well, he was scared, he was frightened.  I think reading the transcript there was even–I think Mr. Dillbeck testified he was threatened by the officer.
>
> And it was all part of our explanation, too, that when he got into a

---

[8]These include a burglary of a conveyance, grand theft, grand theft auto, and possession of marijuana.  See T. Vol. XIV at 2171-72.  Mr. Murrell also presented model inmate mitigating evidence which necessitated the acknowledgment of a prior prison escape attempt in 1983 and a self-defense stabbing of a fellow inmate in 1984.  See id. at 2174-75.

> corner, he would sort of panic.  And that was our way of explaining
> that this was not a crime that was thought out.  I mean, that's what
> happened here at Gayfers, it is what happened when he shot the
> police officer.
>
> So it was all part of, why did he shoot the police officer [?] And it
> certainly seemed to me that it was fair game that he had committed
> a crime in Indiana, stabbed somebody there, and was fleeing from
> that.  So I thought it was admissible.
>
> And I see, too, going back over the transcript, the State had already
> videotaped the victim from Indiana, I think that's where it was,
> Illinois, Indiana.

> Q.    Indiana, I believe.

> A.     And so it was no secret that all that had happened.  And my
> thinking was that it was admissible.  And it just seems to me it is
> better for us to own up to it and address it than to have it come in
> as a revelation introduced by the State.

EH Vol. IV at 644-45.  With regard to presenting some of this information in anticipation
of the State's doing so, Mr. Murrell testified, "I think it is better to reveal the things that
are damaging to you.  It is better for us to do it than to have the State do it." EH Vol. IV
at  648.

     While Mr. Murrell may have opened the door to some of the testimony now
objected to by Petitioner, he was faced with presenting some unfavorable evidence in
conjunction with his mental health and model prisoner evidence or presenting no
evidence at all.  The trial court found that Mr. Murrell made a reasonable strategic
decision to introduce evidence of Petitioner's prior crimes because he reasonably
believed that the jury would be more likely to recommend death if the defense
introduced no mitigation at all.  Petitioner has not demonstrated that this strategy was
outside the broad range of reasonably competent performance under prevailing

professional standards.  To be most effective, the mental health evidence necessarily encompassed Petitioner's prior crimes in order to establish his history of mental health problems and to provide at least a partial explanation for Mrs. Vann's murder. Furthermore, much of the adverse evidence was before the jury and was or would have been introduced by the State in support of its proposed aggravating circumstances. Finally, given the number of aggravating circumstances in this case, it is not reasonable to conclude that introducing Petitioner's prior criminal activities tipped the scale in favor of death.

The state court's factual findings are supported by the record and must be given deference by this court.  Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence.   Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent.  Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law.  Therefore, Petitioner is not entitled to habeas relief on this ground.[9]

Ground VII:  Florida's Capital Sentencing Scheme is Unconstitutional

In his final claim, Petitioner contends that Florida's capital sentencing scheme violates the notice and jury trial rights guaranteed by the Sixth and Fourteenth Amendments, thus not satisfying the requirements of  Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

1.      State Court Proceedings

Petitioner raised a Ring claim in his state petition for a writ of habeas corpus. The Florida Supreme Court denied the claim, holding:

---

[9]Because Petitioner has failed to establish deficient performance, this court will not address the prejudice prong of Strickland other than to note that Petitioner's death sentence is supported by four additional aggravators which is significant in undermining any claim of prejudice pursuant to Strickland.

Case No.: 4:07cv388/SPM

In his petition for a writ of habeas corpus, Dillbeck challenges the validity of his death sentence by arguing that Florida's capital sentencing statute is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed.2d 556 (2002). We rejected similar claims in Bottoson v. Moore, 833 So.2d 693 (Fla.), *cert. denied,* 537 U.S. 1070, 123 S. Ct. 662, 154 L. Ed.2d 564 (2002); King v. Moore, 831 So.2d 143 (Fla.), *cert. denied,* 537 U.S. 1067, 123 S. Ct. 657, 154 L. Ed.2d 556 (2002); and similar cases. Furthermore, one of the aggravating circumstances found by the trial court in this case was Dillbeck's prior conviction of a violent felony, "a factor which under Apprendi [v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed.2d 435 (2000),] and Ring need not be found by the jury." Jones v. State, 855 So.2d 611, 619 (Fla.2003); *see also, e.g.,* Doorbal v. State, 837 So.2d 940, 963 (Fla.2003) (rejecting Ring claim where one of the aggravating circumstances found by the trial judge was defendant's prior conviction for a violent felony), *cert. denied,* 539 U.S. 962, 123 S. Ct. 2647, 156 L. Ed.2d 663 (2003). Accordingly, we reject Dillbeck's claim and deny his petition for a writ of habeas corpus.

Dillbeck II, 882 So.2d at 976-77.

2.      Clearly Established Supreme Court Law

In Ring v. Arizona, supra, the Supreme Court held that a sentencing judge, sitting without a jury, may not find an aggravating circumstance necessary for the imposition of the death penalty, and that the Sixth Amendment requires those circumstances to be found by a jury.  The Court has expressly held that Ring does not apply retroactively to cases on collateral review.  Schriro v. Summerlin, 542 U.S. 348, 358, 124 S. Ct. 2519, 2526, 159 L. Ed. 2d 442 (2004).

3.      Federal Review of Claim

Petitioner's Ring claims are precluded by Schriro v. Summerlin.  See also, Sibley v. Culliver, 377 F.3d 1196, 1208 (11th Cir. 2004).   Furthermore, Florida's capital sentencing procedures do not implicate  the Sixth Amendment concern identified in Ring, which was that Arizona's death penalty system committed both capital sentencing factfinding and the ultimate sentencing decision entirely to the trial judge. Florida, on the other hand, has a hybrid system in which the jury renders an advisory

verdict, but the trial judge makes the ultimate sentencing determination.  See Fla. Stat. 921.141; Ring, supra, 536 U. S. at 608, n. 6.   A  Florida defendant is eligible for the death penalty upon the conviction of first-degree murder.  Because Ring holds that any fact which increases the penalty beyond the statutory maximum must be found by the jury, and because death is the statutory maximum for first-degree murder in Florida, Ring does not establish Sixth Amendment error under Florida's statutory scheme.  See also Hildwin v. Florida, 490 U. S. 638, 109 S. Ct. 2055, 104 L. Ed. 2d 728   (1989)  (per curium) (finding no Sixth Amendment violation with Florida's death penalty scheme that permits judge to find aggravating circumstance authorizing death sentence). Therefore, Petitioner is not entitled to habeas relief on this ground.

## V.  CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  § 2254 11(b).

The court finds no substantial showing of the denial of a constitutional right in this case.  § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, no certificate of appealability is issued herewith.  If either party objects to this denial, that party may file a motion for reconsideration of the denial; however, a motion to reconsider such denial does not extend the time to appeal.  § 2254 11(a).

## VI. CONCLUSION

For the foregoing reasons, the petition for issuance of a writ of habeas corpus (doc. 12) is DENIED.

DONE and ORDERED this <u>twenty-ninth</u> day of January, 2010.


_s/ Stephan P. Mickle_
**Stephan P. Mickle**
**Chief United States District Judge**